UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



07 CV 7434

| | |
|---|---|
| MOSHE MILSTEIN and<br>JOHN J. OKON,<br><br>         Plaintiffs,<br><br>       v.<br><br>FEDERAL BUREAU OF PRISONS,<br>HARLEY LAPPIN, as Director of the<br>Federal Bureau of Prisons, J.M. KILLIAN,<br>as Warden, Federal Prison Camp at<br>Otisville, New York, and GLENN A.<br>FINE, as Inspector General for the<br>Department of Justice,<br><br>         Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT |

**INTRODUCTION**

1.      Plaintiffs bring this class action on behalf of themselves and similarly situated federal inmates seeking declaratory and injunctive relief from Defendants' actions that deprive Plaintiffs and the proposed class of their religious freedoms and their rights to read and access information as guaranteed under the Constitution and laws of the United States.

2.      Over the past several months, Defendant Federal Bureau of Prisons (the "BOP") and the other Defendants have systematically dismembered the chapel libraries at BOP facilities nationwide. These chapel libraries are at the heart of the BOP's obligation to accommodate inmates' religious practices and beliefs, which are now substantially burdened.

3.      Under the so-called "Standardized Chapel Library Project," the BOP has banned and removed all religious books and audio-visual media from its chapel libraries that do not appear on an arbitrary list of pre-approved materials. The BOP had even

required all of its institutions to discard the removed religious materials, and, until after some inmates filed suit, forbade chaplains from even temporarily storing them. Indeed, the BOP has already destroyed or discarded religious texts at some institutions.

4.    Across the country, hundreds and perhaps thousands of religious books and media used by inmates to learn about and practice their faith have been banned and removed without any effort to determine whether they are inflammatory or extremist. In fact, the BOP itself has admitted that the removed materials "may be very worthwhile and unobjectionable."

5.    This purge is an unnecessary, unconstitutional, and unlawful restriction of the ability of federal inmates nationwide to practice and learn about their religion, and has substantially burdened their ability to exercise their religion. For example, in the Federal Prison Camp in Otisville, New York ("Otisville FPC"), Defendants removed hundreds of books, including those that have been in the chapel library for years without incident and without evidence that any of the books were extremist. The books and media that the BOP removed at Otisville FPC form the basis for understanding and practicing Plaintiffs' respective faiths.

6.    Defendants have banned and removed hundreds of Jewish books from the Otisville FPC chapel library. The banned books include such fundamental works as Maimonides' Code of Jewish Law and the *Zohar*, which is the primary text of Jewish mysticism. Even well-regarded titles such as *When Bad Things Happen to Good People*, by Rabbi Harold S. Kushner, were removed.

7.    Hundreds of Christian religious books and media have also been banned and removed, including hymnals and guides, and even best-selling religious titles such as *The Purpose-Driven Life*, by Reverend Rick Warren.

8.    The Muslim portion of the chapel library in Otisville FPC, which was fairly small to start with, now contains only the Koran and two other titles. The BOP has removed Muslim prayer books, prayer guides and the Hadith, which is the most important source for Muslim practice and faith after the Koran.

9.    This kind of indiscriminate dismantling of religious libraries has occurred in federal prisons across the country. Although the BOP has refused to provide additional information concerning inmates that have filed grievances about the removal of religious books and media, federal inmates as far away as California and Florida have contacted organizations outside the prison system seeking to have religious texts and prayer books returned to the shelves so that they can pray, study, practice and learn about their faiths.

10.    This Class Action Complaint seeks declaratory and injunctive relief as redress for Defendants' violations of the Plaintiffs and proposed class members' constitutional and legal rights to religious freedom and to read and access information. On behalf of themselves and the members of the Class, Plaintiffs Moshe Milstein, and John Okon, by their attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP, allege as follows:

## JURISDICTION AND VENUE

11.    This action arises under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 to 706, and the laws and Constitution of the United States. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1434(a)(4), and 2201(a).

12.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**PARTIES**

13.    Plaintiff Moshe Milstein ("Milstein") is an inmate incarcerated at Otisville FPC. He is scheduled to be released on August 28, 2007. Plaintiff Milstein is a devout and practicing Orthodox Jew. Plaintiff Milstein is well-versed in traditional and mystical Jewish practice and rituals, and relies on the chapel library for prayer and study. He also leads prayer services for Jewish inmates and is used as a resource by other inmates interested in the Jewish faith.

14.    Plaintiff John J. Okon ("Okon") is an inmate incarcerated at Otisville FPC. Plaintiff Okon is a devout and practicing Protestant Christian. Although not a minister by vocation, in the absence of regular visits by Christian ministers at Otisville FPC, Plaintiff Okon leads prayer services for Christian inmates and is used as a resource by other inmates interested in the Christian faith. He relies on the materials available in the library for religious prayer and study.

15.    Defendant Federal Bureau of Prisons is the federal agency responsible for all federal prisons.

16.    Defendant Harley G. Lappin is the Director of the BOP and is responsible for the policies, practices and actions at all federal prisons. Plaintiffs sue Defendant Lappin in his official capacity.

17.    Defendant J.M. Killian is the Warden of the Federal Correctional Institution in Otisville, N.Y. ("Otisville FCI"), which encompasses the Otisville FPC satellite facility. Defendant Killian is responsible for the policies, practices and actions at

Otisville FCI, as well as Otisville FPC.  Plaintiffs sue Defendant Killian in her official

capacity.

       18.    Defendant Glenn A. Fine is the Inspector General for the Department

of Justice.  Upon information and belief, Defendant Fine is responsible for the policies,

practices and actions of the office of the Department of Justice Office of the Inspector

General.  Plaintiffs sue Defendant Fine in his official capacity.

<b><u>CLASS ACTION ALLEGATIONS</u></b>

       19.    Plaintiffs bring this action pursuant to Rule 23(b) of the Federal Rules

of Civil Procedure on behalf of themselves and a class of similarly situated individuals who

are incarcerated in all BOP prisons and detention centers (the "Class").

       20.    The Class that Plaintiffs seek to represent is defined as follows:

> All persons who are or will be incarcerated in any BOP prison or detention
> center and who use an institutional chapel library that is subject to the
> Standardized Chapel Library Project.  The class period commences on the
> date of the implementation of the Standardized Chapel Library Project,
> which, upon information and belief, is no later than February 7, 2007, and
> extends to the date on which the BOP is enjoined from or otherwise ceases
> the implementation of the Standardized Chapel Library Project and returns
> and restores all non-extremist religious books and media that have been
> removed from the chapel libraries.

       21.    This action has been brought and may properly be maintained as a

class action under federal law and satisfies the numerosity, commonality, typicality and

adequacy requirements for maintaining a class action under Rule 23 of the Federal Rules of

Civil Procedure.

       22.    The members of the Class are so numerous as to render joinder

impracticable.  Plaintiffs do not know the exact size of the Class because such information is

in the exclusive control of Defendants.  However, upon information and belief, the number

of members in the Class is at least several thousand.

23.     Common questions of law and fact exist as to all members of the Class in that the questions of the lawfulness of Defendants' removal of religious materials from the chapel libraries under RFRA, the APA and the First and Fifth Amendments are common to all members of the Class.

24.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, like all members of the Class, are inmates who use an institutional religious library that is subject to the Standardized Chapel Library Project.

25.     Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

26.     Plaintiffs have retained *pro bono* counsel with substantial experience in the field of class action litigation and with the resources and expertise to prosecute this action.

27.     Plaintiffs seek certification of the Class pursuant to Rule 23(b)(2).  In the alternative, Plaintiffs seek certification pursuant to Rule 23(b)(3).

## FACTUAL ALLEGATIONS

### *BOP Chapel Libraries and Inmate Access to Religious Materials*

28.     The Code of Federal Regulations, 28 C.F.R. (the "Regulations") §548(a), and the BOP policy publication P5360.09 (Program Statement on Religious Beliefs and Practices), requires the BOP to "provide[] inmates of all faith groups with the reasonable and equitable opportunities to pursue religious beliefs and practices . . .."

29.     Pursuant to the Regulations, each BOP institution provides chaplains to minister the religious needs of the inmates.

30.    Pursuant to the Regulations, each BOP institution designates space for religious activities.  Upon information and belief, this space is generally referred to as the prison chapel.

31.    Upon information and belief, the prison chapel at BOP institutions usually houses a library of religious books and media.

32.    Upon information and belief, certain institutions that do not have stand-alone chapels allow for inmates to obtain religious books and media via a check-out circulation system.

33.    A significant portion of the religious books and media that were held at the chapel libraries were donated by religious organizations that are dedicated to the rehabilitation of inmates through religious worship and piety.

### The Chapel Libraries Are a Critical If Not an Exclusive Resource for Inmates to Access Meaningful Religious Books and Media

34.    The chapel libraries are a critical resource for inmates to access the religious books and media necessary to practice their religion because religious materials are not available in the general prison library, and because of restrictions on inmates' ability to purchase, receive and maintain religious materials from other sources.

35.    Pursuant to the Regulations, each BOP institution provides general library services to inmates that offer "a variety of reading materials, including, but not limited to, periodicals, newspapers, fiction, non-fiction, and reference books."

36.    However, the general libraries available at BOP institutions do not contain religious books and media.  The BOP has even directed institutions not to place any religious books and media removed from the chapel libraries into the general libraries.

37.    Upon information and belief, the general libraries at BOP institutions do not have any arbitrary limits on how many books and media it may have.

38.    Upon information and belief, inmates in BOP institutions also have significant practical and economic barriers to obtaining and keeping religious books from outside the prison.

39.    At all BOP institutions, inmates are subject to the so-called "publishers-only" rule. Section 540 of the Regulations and BOP policy publication 5266.10 (Program Statement on Incoming Publications), provides that "[a]t all [BOP] institutions, an inmate may receive hardcover publications and newspapers *only* from the publisher, from a book club, or from a bookstore."

40.    In defending the publishers-only rule in a Supreme Court case, *Bell* v. *Wolfish*, 441 U.S. 520 (1979), the BOP argued successfully that the publishers-only rule was constitutional in part because the prison involved had "a 'relatively large' library for use by inmates, which mitigates any possible harshness of the [publishers-only] rule" *Bell* v. *Wolfish*, 1978 WL 223218, *67 (Pet. App. Br. 26a-27a, 216a).

41.    Upon information and belief, the costs of purchasing books are prohibitive for most inmates because of the limited resources of many inmates and because they may not spend more than a certain amount every month even if they have sufficient funds in their prison accounts.

42.    Even after an inmate has procured a book, he or she may retain only a limited number of books or other possessions at a time.

43.    The BOP imposes further limits on the number of books that an inmate can keep if he or she is transferred to another prison.

44.    Given these restrictions, inmates must rely on the chapel libraries for access to religious materials that are otherwise unavailable to them.

***The Inspector General's Report on the Selection of Muslim Chaplains***

45.    In March 2003, several United States Senators expressed concern that the BOP's procedure for selecting Muslim chaplains did not adequately screen potential chaplains for extremist views.

46.    Senator Charles Schumer also requested that the Office of the Inspector General of the Department of Justice (the "Inspector General") investigate and report on the matter.

47.    In April 2004, the Inspector General issued a report titled *A Review of the Federal Bureau of Prisons' Selection of Muslim Religious Services Providers* (the "Inspector General's Report"), in which the Inspector General cited "deficiencies in how the BOP selects and supervises Muslim religious services providers."

48.    In addition, the Inspector General's Report criticized the BOP's supervision of the chapel libraries. The Report found that BOP institutions failed to maintain inventories of the books and videos in the libraries, and that it did not properly screen these materials.

49.    The Inspector General's Report recommended that the BOP undertake an inventory of its chapel libraries and screen them for security threats.

50.    The Inspector General's Report also suggested that the BOP create a central list of approved books to facilitate the screening process so that materials that have already been approved do not have to be re-screened again and again at each institution.

51.    In a subsequent audit by the Inspector General in July 2004, the Inspector General noted that the BOP agreed to comply with the Report's recommendation and committed to "complete an inventory of current print and audio video materials and review" them.

52.　　Upon information and belief, the BOP did not conduct an inventory of the chapel library holdings; nor did the BOP screen the chapel library holdings.

53.　　Instead, upon information and belief, the BOP instituted the Standardized Chapel Library Project (the "SCLP") through which the BOP banned almost all religious materials and removed them from the libraries.

54.　　The Inspector General's recommendations that the BOP inventory and screen religious materials were thus implemented by simply removing these materials.

### The Standardized Chapel Library Project (SCLP)

55.　　Upon information and belief, the SCLP was instituted by the BOP in response to the Inspector General's Report.

56.　　Upon information and belief, the nationwide implementation of the SCLP began no later than February 7, 2007.

57.　　The SCLP was not codified or published in the Regulations, nor publicized in a manner that adequately notified the public or the inmates. Rather, it was implemented through a series of internal memorandums and directives to the respective wardens and chaplains of BOP institutions.

58.　　Pursuant to the SCLP, the BOP compiled a "standardized list" for each major religious denomination. Each list was limited to a maximum of 150 books, though the list for some denominations contained less than 150 books.

59.　　The SCLP further required that each BOP institution remove all religious books and media not on the standardized list and dispose of them.

60.　　Upon information and belief, there was an effort by some BOP chaplains to mitigate the impact of the SCLP, and at least not to dispose of the books not on the list.

61.    The BOP, however, insisted that books and materials not on the lists must be removed and must be disposed of.

62.    Upon information and belief, the BOP Central Office in Washington, D.C., drafted a memorandum titled *BOP Standardized Chapel Library Questions* (the "SCLP Memorandum"), through which BOP institutions were repeatedly instructed to remove and dispose of all religious materials not on the standardized list:

> [Question:] If material is identified that does not appear on the standardized list, can it be stored until it makes the Standardized list?

> Answer:        No.  There can be **no** storage of materials for future use. Materials cannot be stored in anticipation of future inclusion of placement on the standardized chapel library list of approved resources.

> (Emphasis in original).

63.    The SCLP Memorandum further explained:

> [Question:] What do we do with the material not on the [standardized] list?

> Answer:        . . . All material not on the standardized list must be removed from the institution.
>      . . . .
>      . . . There is an executive decision to remove all materials [not on the list] from the institution.

64.    Similarly, the BOP prohibited chaplains from seeking alternatives to the disposal of the removed books.  The SCLP Memorandum stated that "[m]aterials may not be stored or transferred to the leisure library nor be retained by the chaplain, volunteers or contractors."

65.    The SCLP required that all books not on the standardized list be removed from the shelves by June 1, 2007.

66.    On June 8, 2007, after several inmates filed legal actions challenging the SCLP, the BOP modified the SCLP and has "allowed" institutions to store religious materials that have been removed.

67.    In a memorandum dated June 8, 2007, the BOP also acknowledged that the removed religious materials "may be very worthwhile and unobjectionable."

68.    The removed religious materials at some BOP institutions have already been discarded, destroyed or otherwise disposed of.

69.    Not surprisingly, the SCLP Memorandum described the SCLP as "bad news" for the inmates.  The SCLP Memorandum even instructed the BOP on how to respond to inmate grievances on the removal of religious materials.

*The Removal of Prayer Books*

70.    Pursuant to the SCLP, prayer books were not to be included on the standardized list.  The prayer books were to be removed from the chapel libraries and designated as "worship materials" – to be secured in "group lockers."

71.    Upon information and belief, in practice, many prayer books that were removed from the chapel libraries are now unavailable to inmates.

*Implementation of the SCLP at Otisville FPC*

72.    In the Federal Prison Camp in Otisville, New York ("Otisville FPC"), where Plaintiffs are incarcerated, the BOP has removed hundreds of books including those that have been there for years without incident and without evidence that any of the books or media were extreme or posed any potential danger.

73.    Prior to the removal of books on May 28, 2007, the chapel library in Otisville FPC contained some 1600 religious books and media, which had been accumulated mostly through the generosity of religious organizations and former inmates.

74.    The BOP has never publicly alleged that the chapel library at Otisville FPC contained any extremist religious books or media.  In May 2007, the chaplain at

Otisville FPC informed the Plaintiffs that the BOP would be implementing a new policy concerning religious books and media in the chapel library.

75.     Plaintiffs were told that under this new policy, all books and media that are not on a list of approved materials will be banned and removed from the chapel shelves.

76.     Plaintiffs repeatedly requested from the chaplain and BOP prison staff a copy of the new policy as well as a copy of the approved list of books, but their requests were ignored or rejected.

77.     Plaintiffs informed certain religious organizations of the new policy, which sought to explain to BOP officials the impact of the new policy.  Upon information and belief, representatives of at least one religious group met with high-ranking BOP officials in Washington, D.C., regarding the SCLP but the BOP decided to continue with the SCLP.

78.     On Memorial Day, May 28, 2007, the chaplain arrived at the chapel library at Otisville FPC and removed the books and media not on the approved list.

79.     Upon information and belief, many, if not most, of the books and media in the chapel library were not on the approved list, and hundreds of books and media were removed.

80.     The books that the BOP has removed at Otisville FPC include books and media that form the basis for understanding and practicing Plaintiffs' respective faiths.

81.     The BOP has banned and removed hundreds of Jewish books from the Otisville FPC chapel library.  The banned books include such fundamental Maimonides' Code of Jewish law, the *Zohar*, which is the primary text of Jewish mysticism, and even well-regarded titles such as *When Bad Things Happen to Good People*, by Rabbi Harold S.

Kushner. The BOP has also removed almost all Jewish audio and video materials from the chapel library. The removal and banning of these and other materials has left Plaintiff Milstein and other Jewish inmates without the religious texts and guides necessary for the day-to-day practice of their faith.

82.    Hundreds of Christian books and media were also removed from the chapel library, including hymnals and guides, and even well-regarded titles such as *The Purpose-Driven Life*, by Rev. Rick Warren. The removal and banning of these and other materials has left Plaintiff Okon and other Christian inmates without the religious texts and guides necessary for the day-to-day practice of their faith.

83.    The Muslim portion of the chapel library has all but disappeared. Small to start with, after implementation of the new library policy, the Muslim portion of the chapel library now contains the Koran and two other titles. The BOP banned and removed Muslim prayer books, prayer guides and the Hadith, which is the most important source for Muslim practice and faith after the Koran. The BOP also banned and removed titles such as *How to Say the Prayers* and *Essentials of Muslim Prayers* – as well as phonetic translations of Arabic prayers.

84.    The removal and banning of these and other materials has left Muslim inmates without the religious texts and guides necessary for the day-to-day practice of their faith.

85.    The SCLP has been applied to ban and remove books and media for other religions as well.

86.    The general library at Otisville FPC does not carry religious titles.

87.    Plaintiffs are also subject to the publishers-only rule, and cannot receive any incoming hardcover books except from publishers, books clubs or book stores.

88.    Indeed, after the removal of the materials at Otisville FPC, the Reverend Willie Wilson sent Plaintiff Okon several copies of his own book titled *Releasing Your Spiritual Dynamics* to replace some of the books that were removed from the Otisville FPC chapel library.

89.    These religious books were rejected by the BOP and not delivered to Plaintiff Okon.

90.    Plaintiff Okon was not advised of the basis for not delivering these books to him. Upon information and belief, these books were not delivered to Okon either because the books were not on the list of approved titles or because they did not meet the criteria for incoming publications under the publishers-only rule.

91.    Plaintiffs are sincere and devout in their religious beliefs and practices, and the SCLP has substantially burdened their ability to pray, study, practice and learn about their faith.

92.    Because of the removal of these materials, Plaintiffs now do not have those books and media necessary for them to pray, study, practice and learn about their faith. Without the return of the removed materials from the library, Plaintiffs cannot properly pray, study, practice and learn about their religion and they do not have other practical means to access these religious texts and media.

*Implementation of the SCLP in Prisons Nationwide*

93.    Upon information and belief, the SCLP has resulted in the similar culling of religious libraries in BOP institutions nationwide.

94.    Plaintiffs have not been given access to grievances filed by inmates in the federal prisons regarding the SCLP, but individual federal inmates in facilities as far away as California and Florida have sought help from religious organizations on this issue

and have described a systematic dismantling of religious libraries in their respective prisons, including the removal of prayer books and essential religious texts.

### PLAINTIFFS' PRIOR LAWSUIT

95.     In a *pro se* complaint filed in late May 2007, Plaintiffs sought to enjoin the implementation of the SCLP by filing the action titled *Kelly v. Lapin*, 07-CV-4149 (S.D.N.Y.) (LTS) (FM).

96.     On May 31, 2007, Judge Swain held a telephonic hearing on Plaintiffs' application for an order to show cause and temporary restraining order.

97.     At that conference, Assistant United States Attorney Brian Feldman represented the defendants in that action.

98.     In arguing against an entry of a temporary restraining order, the defendants claimed that the new BOP policy did not envision the immediate discarding of materials not on the standardized list, but that the religious materials would be retained pending further review and expansion of the standardized list.

99.     The defendants further claimed that worship materials were not affected by the SCLP, and indicated that the materials in the chapel library at the Otisville FPC will be retained until at least October 2007.

100.     The Court denied Plaintiffs' application for an order to show cause and a temporary restraining order, noting that the Prison Litigation Reform Act requires inmates to pursue administrative relief.

101.     The Court then directed Plaintiffs to "immediately look into the administrative process at Otisville . . . and make the strongest, clearest arguments that you can make . . . because that is likely to be the procedure that will be truly available to you in

the short term." The Plaintiffs subsequently withdrew the prior lawsuit without prejudice in order to pursue their administrative remedies.

102.    At least one member of the BOP prison staff at Otisville FPC was listening in on the telephonic hearing and the colloquy before the Court.

103.    As such, the Otisville FPC prison officials were very well aware of the lawsuit, the Court's direction that the Plaintiffs immediately file an administrative grievance, and the importance of the grievance process to any legal action on this issue.

104.    However, the prison staff at Otisville made every effort to delay and derail the Plaintiffs' grievance process.

**PLAINTIFFS HAVE EXHAUSTED
THEIR ADMINISTRATIVE REMEDIES**

105.    The Plaintiffs have filed grievances and exhausted their administrative appeals regarding their access to religious materials in the chapel library.

106.    Plaintiffs' efforts to file formal grievances began immediately after the hearing on May 31, 2007, when the Court instructed them to do so. However, the prison staff at Otisville refused to provide the Plaintiffs with the proper forms, provided them with incorrect forms, and refused to accept and process Plaintiffs' grievance forms.

107.    After obstructing the process, the BOP then refused to determine the grievances on the merits and claimed that the grievances were untimely. The BOP's position in this matter – disputed by Plaintiffs – has been that the grievances had to have been filed within 20 days of the removal of the books, even though the unavailability of the books is an ongoing condition.

*Overview of the BOP Grievance Process*

108.    The BOP administrative grievance process established by the Regulations has three levels of formal review:  a) formal review by the warden (Form BP-9);

b) appellate review by the regional office (Form BP-10); and c) final appellate review by the BOP General Counsel (Form BP-11).

109.     Before an inmate can file a BP-9 – the first level of the grievance process – the inmate usually is required to file a BP-8, which is an informal request for the remedy sought by the inmate.  However, the Regulations provide wardens with discretion to consider a BP-9 without the inmate having previously filed a BP-8.

110.     The BP-8 informal request itself further requires inmates to detail their prior informal efforts to resolve the matter, such as submitting a written request known as a "cop-out."

111.     The Regulations require that the BP-9 be filed within 20 days of the matter complained of.  According to the Regulations as interpreted by the BOP, the inmate must attempt informal resolution, file a BP-8 informal request, receive a response to the BP-8, and only thereafter file the BP-9 – all within the 20 days.

***Plaintiffs Exhausted Their Administrative Remedies Despite Obstruction by BOP Staff and Defendant Killian***

*Plaintiff Milstein's Exhaustion of Administrative Remedies*

112.     On June 1, 2007, the day after the court hearing and 4 days after the removal of the religious materials, Plaintiff Milstein filed a BP-8 form, asking for informal resolution of his request to return religious materials to the chapel library.  He submitted the BP-8 to the Otisville FPC Camp Counselor, Ms. Rementer.

113.     On June 4, 2007, Plaintiff Milstein asked Rementer for a response to his BP-8 from so that he could file a BP-9.  Rementer replied that she was still waiting to hear back from the facility's chaplain.

114.     In fact, on June 4, 2007, Rementer had already signed the BP-8 and rejected it.  But she refused to provide Plaintiff Milstein with the completed BP-8.

115.    Several days after June 4, Plaintiff Milstein again asked Rementer for a response to his BP-8. Again Rementer told Milstein that his BP-8 was not completed. Milstein then requested a form BP-9, but Rementer refused to provide him the BP-9, explaining that Milstein cannot file a BP-9 until he gets a response to the BP-8.

116.    On June 13, 2007, Plaintiff Milstein submitted a cop-out form to the Otisville FPC Case Manager, Ms. Welch, asking why he did not receive an answer to his BP-8.

117.    On June 14, 2007, Plaintiff Milstein again requested a BP-9 form from Rementer, but she refused to give Milstein a BP-9, saying that he could not yet file a BP-9 because he has to receive a response to the BP-8. Milstein became concerned that the prison staff might not provide him with a BP-9 before 20 days after the removal of the books. He then typed up his own generic BP-9 form on a blank piece of paper and titled it "Substitute BP-9." He submitted the Substitute BP-9 to the Warden's office on June 14, 2007.

118.    On June 20, 2007, Plaintiff Milstein finally received a response to his BP-8 – a full 19 days after he submitted it. The BP-8 had actually been rejected and signed by Rementer on June 4, 2007, but she withheld it until June 20. In the BP-8 response, Rementer wrote that Milstein's request cannot be informally resolved because the BOP "Central Office issued [the] directive for [the] removal of books."

119.    When Rementer gave Plaintiff Milstein the completed BP-8, Milstein noted to Rementer the discrepancy between the date it was rejected (June 4) and the date it was given to him (June 20). After some back and forth, Rementer recorded the date of delivery of the BP-8 as "6/20/07" together with her initials on the upper-left hand corner of the BP-8.

120.   When Rementer gave Plaintiff Milstein the completed BP-8 on June 20, she also returned to him the substitute BP-9 that he had submitted to Defendant Killian, the Warden. Defendant Killian never processed the substitute BP-9; it was simply returned to Milstein.

121.   Together with her response to the BP-8, Rementer finally gave Plaintiff Milstein a BP-9 form. Milstein filled out the BP-9 and submitted it the same day on June 20, 2007.

122.   On June 25, 2007, Defendant Killian, the Warden, rejected Plaintiff Milstein's BP-9 as untimely because it was received after twenty days from the banning and removal of the books on May 28, 2007.

123.   On July 9, 2007, Plaintiff Milstein appealed to the Regional Office by filing a BP-10. On July 17, 2007, the Regional Office denied Milstein's appeal on the grounds that his BP-9 was untimely. Milstein received the rejected BP-10 on July 25, 2007.

124.   The next day, July 26, 2007, Plaintiff Milstein appealed to the Central Office by filing a BP-11, which is the final administrative appeal. On August 2, Milstein's BP-11 was denied on the on the grounds that his BP-9 was untimely.

*Plaintiff Okon's Exhaustion of Administrative Remedies*

125.   Okon filed his first formal grievance on June 6, 2007, just over a week after the removal of religious materials at Otisville FPC.

126.   Plaintiff Okon, however, mistakenly requested from the BOP staff a BP-11, which is an appellate form, rather than a BP-9. In contrast to the prison staff's refusal to provide Plaintiff Milstein with the correct BP-9 because it was purportedly premature, the prison staff immediately provided Okon with a BP-11.

127.    On June 27, 2007, the BOP Central Office rejected Plaintiff Okon's BP-11 as erroneously filed, stating that he should have filed his grievance with the regional office.

128.    Meanwhile, on June 14, 2007, Plaintiff Okon realized that he should have filed a BP-9. He went to Rementer's office and asked for a BP-9. Rementer was not in her office, and her secretary said that she was not authorized to give him a BP-9. The secretary told Okon to come back the next day.

129.    The next morning, on June 15, 2007, Plaintiff Okon went to Rementer's office again and asked for a BP-9 form. Rementer was in the office, but she told Okon to come back in the afternoon. Okon returned at approximately 3 p.m., but Rementer was gone for the day.

130.    Also on June 15, 2007, Plaintiff Okon submitted a cop-out form to the chaplain asking for a copy of the new policy. He never received a response to the cop-out.

131.    Plaintiff Okon went again to Rementer's office on Saturday, June 16, but she was not in her office. Rementer was also not her office on Sunday, June 17.

132.    On Monday, June 18, 2007, Plaintiff Okon requested and received from Rementer both a BP-8 and BP-9. He submitted the BP-8 the same day.

133.    On June 19, 2007, Plaintiff Okon submitted a BP-9 without waiting for the response to the BP-8.

134.    On June 20, 2007, Rementer rejected Okon's BP-8, stating that it cannot be informally resolved because the directive had been "issued through the Central Office." On June 26, 2007, Okon's BP-9 was rejected as untimely because it was not filed within 20 days after the banning and removal of the books on May 28, 2007.

135.    On July 9, 2007, Plaintiff Okon appealed to the Regional Office by filing a BP-10. On July 17, 2007, the Regional Office denied Okon's appeal on the grounds that his BP-9 was untimely. Okon received the rejected BP-10 on July 25, 2007.

136.    Two days later, on July 27, 2007, Plaintiff Okon appealed to the Central Office by filing a BP-11, which is the final administrative appeal. On August 8, Okon's BP-11 was denied on the on the grounds that his BP-9 was untimely.

## COUNT I
### (Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*)

137.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

138.    Through the actions, policies, customs and practices alleged above, Defendants have imposed and continued to impose a substantial burden on Plaintiffs' religious exercise in violation of the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq.*

139.    Defendants directly and proximately caused Plaintiffs to suffer and continue to suffer great and irreparable loss and injury, including the inability to pray, study, practice and learn about their religion.

140.    Defendants' conduct is not the least restrictive means of furthering any compelling governmental interest.

## COUNT II
### (First Amendment Free Exercise Clause)

141.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

142.    Through the actions, policies, customs and practices alleged above, Defendants have imposed and continued to impose a substantial burden on Plaintiffs' religious exercise in violation of the First Amendment to the Constitution.

143.    In violating Plaintiffs' First Amendment Rights, Defendants directly and proximately caused Plaintiffs to suffer and continue to suffer great and irreparable loss and injury, including the inability to pray, study, practice, and learn about their religion.

144.    Defendants' actions are not reasonably or rationally related to a legitimate penological interest and are an exaggerated response to any such purported interest.

145.    Plaintiffs do not have alternative means to exercise their religious rights to pray, study, practice, and learn about their religion.

146.    Accommodating Plaintiffs' rights to exercise their religion will not unduly burden the BOP prison system.

## COUNT III
### (First Amendment Right to Read and Access Information)

147.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

148.    Through the actions, policies, customs and practices alleged above, Defendants have imposed and continue to impose a substantial burden on Plaintiffs' rights to read and access information in violation of the First Amendment to the Constitution.

149.    In violating Plaintiffs' First Amendment Rights, Defendants directly and proximately caused Plaintiffs to suffer and continue to suffer great and irreparable loss and injury, including the inability to read about and access information relating to religious and spiritual subject matters.

150. Defendants' actions are not reasonably or rationally related to a legitimate penological interest and are an exaggerated response to any such purported interest.

151. Plaintiffs do not have alternative means to exercise their rights to read about and access information relating to religious and spiritual matters.

152. Accommodating Plaintiffs' rights to exercise their rights to read about and access information relating to religious and spiritual matters will not unduly burden the BOP prison system.

**COUNT IV**
**(Fifth Amendment Due Process Clause)**

153. Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

154. Through the actions, policies, customs and practices alleged above, Defendants have restricted and continued to restrict Plaintiffs' religious liberty interests without due process of law in violation of the Fifth Amendment to the Constitution.

155. In violating Plaintiffs' Fifth Amendment Rights, Defendants directly and proximately caused Plaintiffs to suffer and continue to suffer great and irreparable loss and injury, including the inability to pray, study, practice, and learn about their religion.

**COUNT V**
**(Administrative Procedure Act)**

156. Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

157. Defendants imposed the SCLP without codifying or publishing it in the Regulations and have not complied with the publication and rule-making requirements under the Administrative Procedure Act, 5 U.S.C. §§ 552-53.

158.    Defendants' implementation of the SCLP constitutes an arbitrary and capricious act that is contrary to the laws and Constitution of the United States, and therefore violates the Administrative Procedure Act, 5 U.S.C. § 706(2).

159.    Plaintiffs have been adversely affected by Defendants' violations of the Administrative Procedure Act in that they caused Plaintiffs to suffer and continue to suffer great and irreparable loss and injury, including the inability to pray, study, practice, and learn about their religion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the similarly situated members of the Class, respectfully request judgment against the Defendants as follows:

1.    an order certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

2.    declaring that the Standardized Chapel Library Project, on its face and as applied, violates the rights of Plaintiffs and members of the Class to

    (a)    the free exercise of religion under the Religious Freedom Restoration Act of 1993;

    (b)    the free exercise of religion under the First Amendment to the Constitution; and

    (c)    due process of law under the Fifth Amendment to the Constitution;

3.    declaring that the publishers-only rule set forth in BOP Program Statement 5260.10, as applied to religious materials, violates the rights of Plaintiffs and members of the Class to

    (a)    the free exercise of religion under the Religious Freedom Restoration Act of 1993;

    (b)    the free exercise of religion under the First Amendment to the Constitution; and

    (c)    due process of law under the Fifth Amendment to the Constitution;

4.    declaring that the Standardized Chapel Library Project is in violation of the Administrative Procedure Act and thus null and void;

5.   preliminarily and permanently enjoining Defendants, and all
     employees, agents and persons acting in concert with them, from
     further implementing or enforcing the Standardized Chapel Library
     Project;

6.   preliminarily and permanently enjoining Defendants, and all
     employees, agents and persons acting in concert with them, from
     further implementing or enforcing the publishers-only rule set forth in
     BOP Program Statement 5260.10, to the extent it is applied to
     religious materials;

7.   ordering Defendants to return and restore to the chapel libraries at
     BOP institutions any and all religious books and media that were
     removed pursuant to the Standardized Chapel Library Project,
     excepting those books and media that are shown to incite violence and
     extremism;

8.   a monetary award of attorneys' fees, costs and expenses incurred in
     prosecuting this action; and

9.   granting such other and further relief as the Court deems just and
     proper.


Dated:  August 21, 2007


                              PAUL, WEISS, RIFKIND, WHARTON &
                              GARRISON LLP

                              By:_____
                                      Moses Silverman
                                      Solomon N. Klein
                                 1285 Avenue of the Americas
                                 New York, NY 10019-6064
                                 (212) 373-3000

                              *Attorneys for Plaintiffs Moshe Milstein and
                              John J. Okon*


                                      26